Filed 6/15/21  P. v. Valle CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F081069 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BF137858B) |
| HECTOR RUBEN VALLE, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Before Franson, Acting P.J., Peña, J. and Smith, J.

**INTRODUCTION**

In 2013, a jury convicted defendant Hector Ruben Valle of second degree murder, assault with a deadly weapon, and participation in a criminal street gang. The jury also found true gang enhancements, but did not find true allegations defendant committed the murder with premeditation and deliberation, intentionally while being a member of a criminal street gang within the meaning of Penal Code section 190.2, subdivision (a)(22), that he personally used a knife during the commission of the murder (§ 12022, subd. (b)(1), or that he personally inflicted great bodily injury during the assault (§ 12022.7). (Undesignated statutory references are to the Penal Code.) A codefendant was acquitted of all counts.

In February 2019, defendant filed a section 1170.95 petition for resentencing. The court denied the petition without issuing an order to show cause or holding an evidentiary hearing but after defendant was appointed counsel, the People had an opportunity to respond to the petition, and defense counsel filed a reply. Defendant appeals the court's denial of his petition, arguing he established a prima facie showing he is entitled relief as a result of the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). He asserts he should be entitled to a remand for an evidentiary hearing on his petition at which the prosecutor will bear the burden of proving beyond a reasonable doubt that he is ineligible for relief.

We agree with defendant's contention, reverse the court's order denying defendant's petition, and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2011, defendant, Ismael Valle, and Saul Gonzalez were charged with willfully, unlawfully, deliberately, and with premeditation and malice aforethought, murdering Cipriano Maldonado in violation of section 187, subdivision (a) (count 1). As to defendant, count 1 was enhanced by allegations the murder was done with premeditation and deliberation within the meaning of section 189; the murder was intentional and

committed while defendant was an active participant in a criminal street gang and carried out to further the activities of the criminal street gang within the meaning of section 190.2, subdivision (a)(22); the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1), and is a serious felony within the meaning of section 1192.7, subdivision (c)(28); and defendant personally used a deadly or dangerous weapon, to wit: a knife, within the meaning of section 12022, subdivision (b)(1), in the commission of the murder. The three defendants were charged in count 2 with willfully and unlawfully committing an assault upon Abelardo Zorrilla with a deadly weapon, to wit: a knife, in violation of section 245, subdivision (a)(1). As to defendant, count 2 was enhanced by allegations the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members, withing the meaning of section 186.22, subdivision (b)(1), and defendant personally inflicted great bodily injury upon Zorrilla within the meaning of section 1192.7, subdivision (c)(28). The three defendants were charged in count 3 with willfully, unlawfully, and actively participating in a criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity and did willfully, promote, further, or assist in felony criminal conduct by gang members, in violation of section 186.22, subdivision (a).

The jury convicted defendant of the lesser included offense of second degree murder (count 1) and found true the allegation the offense was committed for the benefit of a criminal street gang; it did not find true the other enhancement allegations to count 1. The jury also convicted defendant of assault with a deadly weapon (count 2), finding the

3.

related gang enhancement true, and active participation in a criminal street gang (count 3). Codefendant Saul Gonzalez was acquitted of all three counts.[1]

The following facts were detailed in our court's prior opinion from defendant's direct appeal of his convictions, which both parties refer to in their briefing:

> "This case arose after a violent clash between two groups of young males in the Loma neighborhood of Bakersfield. After the clash, Abelardo Zorrilla and Cipriano Maldonado were stabbed. Zorrilla was wounded and Maldonado died at the scene from stab wounds to his neck. The prosecutor's theory was that either defendant or Gonzalez stabbed Maldonado, and the same person may have stabbed Zorrilla. The prosecutor argued the jury could find both defendants guilty without agreeing on who killed Maldonado under the theory they were aiding and abetting each other.

> *"Background*

> "The summer of 2011, defendant lived with Thalia Bravo and their children in a three-bedroom home in Bakersfield. Two other adults, including Bravo's brother Alberto Bravo, lived in the house. Defendant's house was a party house, with a constant stream of people coming and going as well as drinking. Defendant and Bravo had been together for 10 years since defendant was 12 and Bravo was 13.

> "Defendant and his younger brother Ismael Valle were self-admitted members of the Okie Baker criminal street gang. Defendant had been a member of the gang since he was 13 years old and went by the moniker Soldier Boy or Soldier. Defendant's home was in territory claimed by the rival Loma Baker gang. Okie Baker graffiti, including defendant's moniker Soldier had been spray painted behind his house.

> "Codefendant Saul Gonzalez lived about 10 minutes from defendant's home. Gonzalez was 21 years old and was friends with Alberto Bravo. Gonzalez and Alberto Bravo were members of The Few Chosen (TFC), a tagging crew unaffiliated with the Okie Bakers. Matthew Vega was also a friend of Alberto Bravo's and spent time at defendant's home.

---

[1]Ismael Valle accepted a plea and did not go to trial with defendant and Gonzalez.

"Jamie P. was 15 years old and was introduced to defendant and Bravo by her friend in February 2011. Jamie P. became a regular visitor at defendant's home and began dating Gonzalez.

"In July 2011, Daniel V. was Cipriano Maldonado's best friend. They were both 15 years old. Abelardo Zorrilla was Maldonado's 18-year-old cousin and spent nearly every day with him. Zorrilla was also close friends with Daniel V. Zorrilla, Daniel V., and Maldonado were not gang members. Zorrilla described Maldonado as a 'skater' and said neither one of them were gang 'wannabes.'

*"Events Leading to Incident*

"On July 29, 2011, Jamie P. arrived at defendant's home between 8:00 and 9:00 p.m. with her friend. There still was some light outside. Defendant and Bravo were both there. Bravo testified she did not remember exactly when she and defendant arrived home, but there was still light outside. Bravo explained her family went to Beale Park at 8:00 p.m., went to a friend's home between 9:00 and 9:30 p.m., and went back to their own home between 11:00 and 11:30 p.m.

"When Jamie P. arrived at defendant's home, several people were already there including Matthew Vega, Ismael Valle, Luis Reyes, Alberto Bravo, and Angel Lopez. Jamie P. could not remember if Bravo's two sisters were there. Gonzalez arrived after it was dark outside. Bravo testified defendant was the only one drinking that evening, and on a scale of one to 10—with 10 being falling down drunk—defendant was a five. Jamie P. thought that most of those at the party were a little drunk.

"Jamie P. described Ismael Valle, Reyes, and defendant as beginning to get aggressive, trying to pick a fight with the people who were walking by defendant's house. Jamie P. said '[t]hey were banging the opposite hood of where they're from.' They were yelling out the name of the rival Loma gang to see how passersby would respond. Jamie P. had reason to believe defendant 'bangs Okie.' No fights occurred that evening despite defendant's conduct. Jamie P. thought defendant especially was trying to pick fights with people walking by his home. Gonzalez was not involved in this activity, did not interact with defendant, and spent his time arguing with Jamie P.

"Gonzalez was wearing a black and red plaid shirt that evening as shown in People's exhibit 28, wore earrings, and had piercings in his lower lip. Jamie P. told police officers that defendant was wearing a white or gray shirt and blue shorts. Defendant had a goatee, had 'OB 13' tattooed

5.

on his arms, and was wearing a white T-shirt when he was arrested as depicted in People's exhibit 2. Bravo initially told police defendant was wearing a white tank top during the incident, but changed her account and said he was wearing a dark blue shirt without sleeves with dark-colored gym shorts. Ismael Valle was wearing a charcoal gray shirt.

"Maldonado, Daniel V., and Zorrilla left Daniel V.'s home on foot between 2:00 and 3:00 a.m. the morning of July 30. They were getting rid of a stray dog that had been bothering Daniel V.'s dog; they took it to an alley south of Oregon Street and left it there. As the three headed back on Brown Street toward Daniel V.'s home, a green Honda drove past them as they were crossing Oregon Street. Bravo owned the green Honda.

"Defendant drove the car in search of marijuana with Bravo, Jamie P., Gonzalez, Vega, Ismael Valle, and one of Bravo's children as passengers. Reyes was not in the car. Bravo and her daughter were in the front passenger seat. Ismael Valle and Vega were sitting in the back seat with Gonzalez. Jamie P. was sitting on Gonzalez's lap. Jamie P. thought she and Gonzalez were going to be dropped off at his house to have sex before the others bought marijuana. Jamie P. did not initially explain this to police because she did not want her mother to know her plans for that evening.

## "Fight and Stabbings

"Jamie P. thought defendant still appeared to be drunk and in a 'hyped' state as he drove. Jamie P. did not see weapons in the car. Maldonado, Daniel V., and Zorrilla were walking just past Oregon Street. Defendant yelled 'Okie' at them as he drove through the intersection of Oregon and Brown Streets. Jamie P. saw Maldonado 'throw' an 'L' sign with his hand and defendant reported this to the others in the car. Bravo explained that 'L' stood for the rival Loma gang and the young men were the ones who started 'banging' as the car drove through the intersection. Vega yelled 'B Dub,' Gonzalez yelled 'TFC,' and defendant and Ismael Valle yelled 'Okie.'

"Daniel V. testified that when the green Honda passed them, someone in the car yelled 'OB' which stood for Okie Bakers. Daniel V. yelled back 'Gage Street,' which is a subset of the Loma Baker gang, and Zorrilla said 'Loma.' Daniel V. was not sure whether Maldonado threw an 'L' gang sign or just 'flipped off' those in the green car. Zorrilla denied meaning anything by the comments, explaining he and his companions did not want to fight, and none of them were gang members. According to Zorrilla, everyone uses gang slurs and doing so is not a big deal. Zorrilla

also heard someone in the green car yell 'OB' and Daniel V. yelled out 'Gage Street.' They continued walking down Brown Street. Maldonado took off his shirt not because he wanted to fight but because it was hot.

"According to Bravo, defendant had a temper and got angry when pedestrians started banging. Defendant sped up, took right turns on nearby streets, and headed up Brown Street toward the three young men. Jamie P. believed defendant seemed anxious to fight. No one was speaking or telling him what to do. Jamie P. explained that defendant pulled over the car, got out, and told the others, 'Let's go.' According to Jamie P., defendant was the oldest and it seemed to her he 'ran' the others. Defendant made the decisions. All the males exited the car and took off running.

"Bravo moved to the driver's seat and told Jamie P. to hold the baby and sit in the passenger seat. Bravo drove the car toward where the males had run and made a U-turn not far from where they were encountering Maldonado, Daniel V., and Zorrilla. Jamie P. could see the males fighting, but not clearly at first because she could not determine who was fighting who. Jamie P. described the fight happening in about 60 seconds. Maldonado and Gonzalez struck each other about five times each for five to six seconds, but Jamie P. could see Gonzalez's hands and he was not holding a knife. Maldonado briefly grabbed Gonzalez's neck, Jamie P. was distracted by the baby for about 20 seconds, and when she looked back at the fight, Gonzalez had stepped away from Maldonado.

"Jamie P. then saw defendant begin to fight Maldonado. She was 25 feet away from the combatants. Jamie P. saw defendant strike Maldonado but could not tell at first whether he had a knife in his hand. Defendant struck Maldonado in a hook-like motion that looked different from a punch. As defendant pulled his hand away from Maldonado, Jamie P. could see a knife in his right hand. Maldonado immediately stopped, grabbed his neck, stumbled a few feet, and fell down. Blood was gushing over Maldonado's chest before he fell down. Maldonado's friends surrounded him and yelled defendant had killed their 'homey.' Defendant stood staring at the bleeding victim for a moment until everyone yelled at him to get back into the car.

"At first, Jamie P. denied telling police she saw defendant return to the car with a bloody knife in his hand. Jamie P. said she was not drunk the night of the incident, but she was afraid she might get into trouble. She changed her story about looking for marijuana because she did not want her mother to know what she was doing. Jamie P. was afraid at trial because she had received threats and was trying to be brave. Jamie P. was scared when Bravo walked into the courtroom. When defendant returned to the

7.

car, Jamie P. saw him holding a knife with blood on it, just as she told the police after the incident. When they returned to the house, Gonzalez did not have blood on himself.

"Bravo testified that after she drove the car, made the U-turn, and stopped, she looked back to watch the fight. Bravo saw a guy walking who had been cut. The guys scattered and came back to the car. Everyone went back to Bravo's home but no one had blood on them. Bravo did not see who was fighting who, and she did not know who stabbed Maldonado. Bravo did not see the fight start or who threw the first blow. Bravo believed she was parked 50 to 55 feet away from the fight and did not see any knives. According to Bravo, Gonzalez was wearing the plaid shirt depicted in People's exhibit 28.

"Daniel V. testified the guy with lip piercings wearing a black and red plaid shirt similar to the one depicted in People's exhibit 28 swung first and struck Maldonado in the neck. Daniel V. said the shirt depicted in People's exhibit 28 had one extra color than the plaid shirt worn by Maldonado's attacker. Daniel V. explained the first punch was to the neck, and the fight lasted for 10 minutes. Daniel V. later saw the guy in the plaid shirt with a knife in his left hand. He also saw a second assailant with a knife.

"A light-skinned assailant wearing a gray shirt and a goatee was one of the attackers. Zorrilla did not think Gonzalez had the same light color of skin. Zorrilla could not recall who was fighting with Maldonado. The man in the plaid shirt and lip piercings took the first swing. Zorrilla, however, did not see the assailant in the plaid shirt with a knife. It was the assailant with light skin that Zorrilla saw with a knife. Zorrilla thought People's exhibit 28 looked similar to the plaid shirt worn by the assailant.

"Zorrilla was jumped, suffered several blows, and blacked out before he threw any punches. Zorrilla regained consciousness and noticed the green car driving up. After the blackout, Daniel V. called Zorrilla. Zorrilla said he threw some punches. According to Zorrilla, the fight ended when blood began pouring out of Maldonado's neck. Within 30 to 40 seconds Maldonado lost control of his body. Zorrilla caught Maldonado and placed him on the ground. Initially Zorrilla testified the fight lasted two to three minutes, later he testified the fight lasted three to four minutes. The fighting stopped and the assailants left the scene in the car. The assailant with light skin paused before running back to the car.

"Zorrilla said the first swing at Maldonado was made by the man with piercings and the plaid shirt, but Zorrilla did not see this man holding

a knife. Zorrilla reiterated his earlier testimony that he saw one assailant that evening with a knife. He did not see the person who stabbed him and did not see Maldonado being stabbed. Zorrilla said the man with the knife was light skinned and was wearing a dark shirt. Zorrilla suffered a two-inch stab wound that required hospitalization and two staples.

"Jamie P. stated after they went back to defendant's home, he and Bravo prevented her from leaving until daylight, even though Jamie P. wanted to go home. Bravo threatened Jamie P. about coming to court and testifying because she would 'be caught in the streets.' Jamie P. was very fearful to testify and as soon as she saw Bravo, she wanted to get off the witness stand as soon as possible. Bravo denied preventing Jamie P. from leaving their home after the incident and denied threatening Jamie P. about testifying at trial. According to Bravo, defendant denied stabbing Maldonado. Also, defendant was a good fist fighter and did not need a knife.

### "Statements to the Police

"When Jamie P. was questioned by police, she told them defendant was wearing either a white or gray shirt the night of the incident. During the fight, Jamie P. saw defendant step behind Maldonado and cut or stab him on the right side of his neck. After the fight, defendant was holding a bloody knife in his left hand. Jamie P. also overheard someone tell defendant to get rid of the knife. She did not tell police that she had planned on going to Gonzalez's home to have sex.

"Bravo initially told police Luis Reyes was at the fight while she was home asleep. Police, however, had a receipt from Jack-in-the-Box from Bravo's car for the morning of July 30 at 4:00 a.m. Bravo expressed fear for her personal safety if she came to court. Bravo then said defendant was driving and she was a passenger when words were exchanged with another group of males. The males in the car got out to fight. Bravo said Reyes, Ismael Valle, Jamie P., and another guy were in the back seat. When Bravo saw the fighting, she drove home.

"Bravo said nothing about her child being in the car. Bravo explained defendant had a problem with these three males in the past and they came to her home threatening her and defendant. One had come to their home and threatened them, although she could not provide a date. Although Bravo initially said defendant was wearing a white shirt, she changed her story and said he was wearing a dark blue tank top. Bravo told police defendant carried a black pocket knife and so did Reyes. Bravo told police she never saw the stabbing.

9.

"When questioned by police, Daniel V. had claimed he did not yell anything at the passing green car. He had also said he saw three people with knives at the fight. Zorrilla had told investigators that when someone yelled 'Okie Bakers' from the car, he yelled back 'Loma.' Zorrilla also said that Daniel V. threw an 'L' with his right hand. Zorrilla had not told the police he had blacked out during the fight. Zorrilla had not recognized Gonzalez in a photographic lineup as a participant in the fight.

"When Gonzalez was interrogated by police, he told them he had no idea why they were questioning him. Gonzalez said on [*sic*] the time of the incident he was with a woman in her 30's named Tonya and they went to Little Caesar's to have pizza and then 'hung out' together at her house, where he slept from 11:30 p.m. until 3:30 a.m. when he went home to get ready for work. Gonzalez said he had been wearing a white Pro Club T-shirt and black shorts. When confronted with the fact that a search made of Gonzalez's house pursuant to a warrant revealed a checkered shirt, Gonzalez said he was wearing the checkered shirt. Gonzalez later admitted he was present at the fight and said the person he was fighting with was bleeding a lot.

"Detective Michael Hale was lead homicide investigator in this case and interrogated defendant. Hale explained that during questioning, defendant initially denied he was involved in a fight and tried to place someone else at the scene. Defendant later said there was 'some dude just laying right there' on the ground, and was 'like what the fuck just happened.' But defendant did not know what had happened, just 'somebody stuck that fool.' Defendant said he did not know who had the blade. Defendant said it was Gonzalez who 'squared up' with Maldonado. Defendant claimed to be fighting another person and could not 'believe that little guy got stuck.' Defendant also said Reyes fought with the victim.

"Defendant was given his *Miranda* rights and agreed to questioning. His recorded interrogation was played for the jury. Defendant said he did not know who had a knife. Words were exchanged and a dark-skinned guy threw a punch at defendant. Gonzalez was next to defendant and started to fight a fat guy. Reyes was fighting the skinny little guy. Gonzalez was still fighting … 'that fool' and Reyes came in between defendant and the person he was fighting. The 'little guy' backed up grabbing his neck. Defendant did not see who had stabbed him. The guy defendant had been fighting yelled they had killed his 'homie' and there was blood splattered everywhere.

"As questioning progressed, defendant said it was possible Gonzalez, not Reyes, squared off with the guy who was stabbed.

10.

Defendant said he was wearing a white T-shirt with blue shorts but later said they were all wearing dark colors that evening.  Defendant said he shaved earlier and denied he shaved after the fight.

## "Defendant's Jail Conversation

"A recording of a phone conversation defendant had with a relative after he was charged with murder was played for the jury.  The parties stipulated it was defendant's voice on the recording.

"'[E]verybody tells me have faith, have faith, and it's like, you know, how do you want me to have faith when God won't even give me a little … something … you know what I mean, treat me like Moses.  You know what I mean, I was like, he started—he killed somebody too, you know what I mean, and, and you know what I mean, and God forgave him and, and God, you know what I'm saying, throughout [*sic*] him, you know, he brought Egypt out [*sic*] and then started …, why can't he do that with me …?'  [¶] … [¶]

## "Autopsy Report

"Dr. Adel Shaker, a forensic pathologist, reviewed photographs and the autopsy report on Cipriano Maldonado.  Maldonado died from a complex stab wound that involved two wounds to the right side of his neck.  The first path came from behind the neck up to the middle of the neck, from the right to the left, up and down.  The second path came from the middle of the neck upward and rightward, from below and went up the neck.  Though the wounds were separate, they came together with edges from each wound meeting in the middle of Maldonado's neck.  The wound was three inches deep, reaching the spinal cord.  Together, the wounds were about seven inches long.

"Dr. Shaker could not tell if the wounds were both made from the same knife.  The wounds cut the jugular vein and the carotid artery supplying blood to the brain, and the vagus nerve leading from the brain to all internal thoracic and abdominal organs.  The wounds would have caused death in less than five minutes.  The victim could have walked and talked sensibly for a few minutes.

## "Gonzalez's Testimony

"Gonzalez testified he was an artistic tagger with TFC and associated with other taggers who could draw and write.  The TFC group was not a gang and did not draw gang graffiti.  Gonzalez and Alberto Bravo

11.

were good friends. Neither one of them were gang members and Alberto Bravo was still going to high school. Defendant did not communicate with Gonzalez about gang activities and Gonzalez did not know defendant had been stabbed earlier in July. Gonzalez was finishing high school, had a good job, and had stopped doing graffiti in late 2010 or early 2011.

"About 2:00 a.m., Gonzalez wanted to go home with Jamie P. to have sex. Defendant, Bravo, their child, Vega, and Ismael Valle were leaving to buy marijuana so they offered Gonzalez and Jamie P. a ride. Everyone got into the car. There was no mention of weapons or getting into a fight. Defendant drove with Bravo and their daughter in the front passenger seat. Jamie P. was sitting on Gonzalez's lap in the back seat with the others.

"At the intersection of Brown and Oregon Streets they saw three males crossing the street on foot. One of the males yelled Loma; defendant yelled back Okie. Defendant slowed the car. Bravo told him to forget it and just keep going, but defendant felt disrespected. Defendant looked mad, and when Bravo asked defendant what he was doing, he replied, 'fuck that' and said they were going back. Defendant drove the car back to where the three males were. Gonzalez did not want to go but felt defendant would have beaten him up if he did not comply because defendant does whatever he wants.

"Defendant was wearing a dark shirt and shorts. Ismael Valle was wearing a darker colored shirt. Gonzalez was wearing the plaid shirt depicted in exhibit 28. Gonzalez also had lip piercings. During the incident, defendant had a goatee with long sideburns down to his chin.

"When he exited the car, Gonzalez believed there would be a fight. The group began speed walking toward Daniel V., Maldonado, and Zorrilla. Gonzalez did not yet see any weapon. When the two groups converged, Daniel V. and Zorrilla were in front with Maldonado a few feet behind them. Gonzalez had never seen them before. Defendant was facing Daniel V. and Gonzalez was facing Zorrilla. Ismael Valle was behind defendant and Vega was behind Ismael.

"After Zorrilla and defendant traded insults over Loma and Okie, Zorrilla threw the first punch at Gonzalez, striking him in the right cheek. Gonzalez tried to defend himself by throwing a couple of punches. Defendant and Ismael Valle went around Gonzalez. Zorrilla was getting the best of Gonzalez, so he backed off. As Gonzalez moved back, he saw Maldonado about 30 feet away on the ground grabbing his neck. Gonzalez

12.

did not have a weapon and did not see anyone else with one. Gonzalez did not see any stabbing. Gonzalez said he had not struck Maldonado.

"When Zorrilla went to help Maldonado, Gonzalez ran back to the car. Before getting back into the car, Gonzalez looked back and saw defendant with an open pocketknife in his hand with a blade five to six inches long. He also later saw defendant with the knife inside the car. Ismael Valle kept asking defendant what had he done before telling defendant to get back into the car. Defendant took off his dark shirt and wrapped the knife in it. Both Ismael Valle and Bravo asked defendant what had he done. Everyone was shocked. Defendant told everyone not to say anything, which Gonzalez took as a threat. Back at defendant's home, Gonzalez overheard defendant say, 'I stuck this fool.'

### *"Defendant's Testimony*

"Defendant testified he had felony convictions for possession of a deadly weapon and attempted burglary. Defendant was given the moniker Soldier Boy because he was always ready to fight. For defendant, there is no difference between being ready to fight for the gang or on a personal basis. Defendant placed some of the tagging on his back fence to protect his home. Some of the gang graffiti was placed by others on defendant's behalf.

"Defendant admitted Reyes was not in the car the evening of the incident, though he then said he did not remember whether or not Reyes was in the car. Defendant clarified that he did not remember Reyes being in the car. Defendant later said he told officers Reyes was in the car, but he was mistaken and was not intentionally lying. Defendant described the passengers in the car consistently with other witnesses.

"Defendant denied knowing the three males walking down the street the evening of the incident. When he drove past Maldonado, Zorrilla, and Daniel V., Gonzalez yelled a neutral slogan but Ismael Valle yelled Okie. Zorrilla twice yelled Loma. Defendant took the Loma chant as disrespectful but denied yelling Okie or anything else. Defendant said others in the car told him to pull over. Defendant did not want to do so because his daughter was in the car. As they drove up to another intersection, Gonzalez said, 'let's go back.' Defendant parked the car and all of the males exited the car at the same time. Defendant could not remember if he ordered them out of the car. Defendant said no one was looking for a fight that night and there was no mention of knives or other weapons.

13.

"Defendant's group walked over to the others and he exchanged expletive insults with Zorrilla over Loma and Okie. Gonzalez was next to defendant when Zorrilla threw the first punch at defendant. Gonzalez reached over and grabbed Zorrilla by the shirt as defendant was still fighting Zorrilla; Gonzalez only ripped Zorrilla's shirt. Defendant stopped fighting with Zorrilla, but Zorrilla continued to throw punches at Gonzalez. Daniel V. yelled to Zorrilla and defendant saw Maldonado holding his neck with blood on the ground. Maldonado could no longer stand and fell back.

"Defendant admitted he was the last person in the car, but he did not have a knife. Defendant said he was wearing a white T-shirt and gym shorts that night. Defendant explained he was a dropout from the gang. Defendant asserted Bravo was untruthful when she testified that he kept a pocketknife. Defendant denied ever using a knife or seeing a knife the evening of the incident and said he only fought with his fists. Defendant denied stabbing Maldonado and Zorrilla. When he made the Moses comment in jail, defendant felt morally responsible for what happened.

"Defendant also admitted that on July 9 he was confronted by five rival Loma Baker gang members at his home and he pulled out a shotgun. After doing so, the Loma Baker gang members left. Defendant denied pointing the shotgun at anyone and only brandished it to scare the people away. Defendant said the shotgun belonged to his cousin. Defendant dropped the gun and ran away from it when Probation Officer Lloyd Knowles arrived. Defendant denied Maldonado was one of the people to whom he brandished the gun. Defendant did not know the actual names of those individuals but said two of them had the monikers Palms and Hazek." (*People v. Valle* (Feb. 14, 2017, F069356) fns. omitted [nonpub. opn.] [2017 Cal.App. Unpub. Lexis 1048 at pp. *3–*28; 2017 WL 589109 at pp. *2–*9].)

In February 2019, defendant submitted a petition for resentencing pursuant to section 1170.95 using a preprinted form supplied by Re:Store Justice, a cosponsor of Senate Bill 1437. He checked boxes stating a charging document had been filed against him allowing the prosecution to proceed under a felony-murder theory or the natural and probable consequences doctrine; at trial, he was convicted of first or second degree murder under a felony-murder theory or the natural and probable consequences doctrine; and he could not now be convicted of murder in light of changes made to sections 188 and 189, effective January 1, 2019 (pursuant to Senate Bill 1437). He also checked a box

indicating he was convicted of second degree murder under the natural and probable consequences doctrine or under the second degree felony-murder doctrine and a box stating, "I request that this court appoint counsel for me during this re-sentencing process." The court appointed defendant counsel.

The People responded to the petition, arguing it lacked merit because the evidence established defendant was the "actual killer" and he was not convicted under a felony-murder or natural and probable consequences theory. Alternatively, the People argued, even if either the felony-murder or natural and probable consequences theory applied, the evidence established defendant aided and abetted the actual killer with the intent to kill and/or that he was a major participant who acted with reckless indifference to human life. In support, they argued "the record is replete with substantial evidence to show that [defendant] was the actual killer," including that the jury convicted him of murder and acquitted his codefendant, Gonzalez, on all counts. They argued "[t]his verdict is consistent with the evidence showing that [defendant], alone, killed V-Maldonado" and inconsistent with the natural and probable consequences theory. With regard to the felony-murder rule, they argued no underlying enumerated felony-murder offense was charged, and no felony-murder instructions were presented to the jury. The People attached our appellate opinion from defendant's direct appeal, as well as the record of the jury instructions given to the jury, which stated in relevant part:

> "To prove that the defendant is guilty of murder as charged in Count 1 or the lesser crime of voluntary manslaughter, or to prove the defendant is guilty of assault with a deadly weapon as an aider and abettor as charged in Count 2, or the lesser crime of battery, the People must prove that:
>
> "One, the defendant is guilty of assault, battery, fighting, or challenging someone to fight or unlawful assembly;
>
> "Two, during the commission of assault, battery, fighting or challenging someone to fight or unlawful assembly, a co-participant in that assault, battery, fighting or challenging someone to fight or unlawful

15.

assembly committed the crime of murder, voluntary manslaughter, assault with a deadly weapon, or battery;

"And, third, under all of the circumstances a reasonable person in the defendant's position would have known that the commission of murder, voluntary manslaughter, assault with a deadly weapon, or battery was a natural and probable consequence of the commission of the assault, battery, fighting, or challenging someone to fight or unlawful assembly."

The jury instructions reflected the court also instructed the jury on murder with malice aforethought. The court explained defendant was being prosecuted for first degree murder under two theories: willful, deliberate and premeditated murder, and murder committed by lying in wait.

The People also filed a separate motion to dismiss defendant's petition on the grounds Senate Bill 1437 is unconstitutional. The trial court denied the motion to dismiss without prejudice.

In his reply brief, defendant argued the prosecution's theory at trial was that codefendant Gonzalez was the actual killer. Defendant attached the reporter's transcript reflecting the prosecutor's closing argument in support. Defendant further argued the jury was instructed on the natural and probable consequences theory, and there was ample evidence demonstrating he was guilty of starting the fight and nothing more.

The court denied the petition in a minute order without providing its basis for the denial.

## DISCUSSION

Defendant challenges the denial of his petition for resentencing. We reverse the court's order denying the petition and remand for the court to issue an order to show cause and hold an evidentiary hearing at which the prosecution will bear the burden of proving, beyond a reasonable doubt, that defendant is ineligible for relief.

### I. Senate Bill No. 1437 and Section 1170.95

On September 30, 2018, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[s] the felony murder rule and the

16.

natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amends section 188, which defines malice, and section 189, which defines the degrees of murder to address felony murder liability, and it adds section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2–4.)

Accordingly, section 188 now provides that, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime*." (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, section 189 previously stated, "All murder … which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and

acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Newly enacted section 1170.95 permits those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (*Id.*, subd. (a).) An offender may file a petition under section 1170.95 where all three of the following conditions are met:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3).)

A trial court receiving a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (*Ibid.*) The trial court must then hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously been [*sic*] sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).)

## II. Analysis

Defendant argues the court erred in concluding he did not establish a prima facie showing he is entitled to relief as a result of Senate Bill 1437 and instead concluding he was categorically ineligible for relief pursuant to section 1170.95. He asserts there were disputed facts as to whether he was the actual killer and regarding the theory under which he was convicted, and the court was prohibited from engaging in judicial factfinding

18.

without holding an evidentiary hearing. He asserts the jury was explicitly told it could convict him of murder through a natural and probable consequences theory. He contends "it is unclear what the trial court found because it failed to issue a written opinion beyond the Minute Order stating it was denied," asserting this should be grounds for reversal in and of itself. He also notes the jury could not reach a verdict on the allegation defendant personally used a knife in the commission of the murder, undermining the argument the jury found he was the actual killer, given that the victim was stabbed to death. The People respond the record established defendant was categorically ineligible for relief because he was the actual killer, not convicted under the felony-murder rule (no enumerated felonies pursuant to § 189 were charged) or the natural and probable consequences doctrine, and he was a major participant who acted with reckless indifference to human life. They argue, though the jury did not find true the allegation defendant personally used a knife in the commission of the murder, the jury's "inconsistent verdict does not diminish the substantial evidence presented at trial that [defendant] was the actual killer." They concede the jury was instructed on the natural and probable consequences doctrine, but assert the jury necessarily did not convict defendant of murder under this theory given that the jury acquitted the codefendant of all the charges; the prosecutor's theory of the case was that either defendant or his codefendant stabbed the victims. Defendant responds he could have been convicted under a natural and probable consequences theory even though his codefendant was acquitted because there were more than two people involved in the gang fight and any one of the other people could have been the killer. He also argues the jury did not determine he was the actual killer and the court would have had to resolve disputed facts to conclude he was a major participant who acted with reckless disregard, which was inappropriate at the prima facie showing stage. We agree with defendant; the record before us does not establish he was categorically ineligible for relief as a matter of law.

19.

In *People v. Drayton* (2020) 47 Cal.App.5th 965 (*Drayton*), the Sixth District Court of Appeal described the procedure for assessing whether a prima facie showing has been made under section 1170.95 as comporting with that of a habeas corpus proceeding:

> "[W]hen assessing the prima facie showing, the trial court should assume all facts stated in the section 1170.95 petition are true. [Citation.] The trial court should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law—for example, a petitioner's assertion that a particular conviction is eligible for relief where the crime is not listed in subdivision (a) of section 1170.95 as eligible for resentencing. Just as in habeas corpus, if the record 'contain[s] facts refuting the allegations made in the petition … the court is justified in making a credibility determination adverse to the petitioner.' [Citation.] However, this authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subd. (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime). [¶] If, accepting the facts asserted in the petition as true, the petitioner would be entitled to relief because he or she has met the requirements of section 1170.95(a), then the trial court should issue an order to show cause." (*Drayton*, *supra*, at p. 980; accord, *People v. Duchine* (2021) 60 Cal.App.5th 798, 811–812 (*Duchine*).)

Considering this standard, here, defendant established a prima facie case he is eligible for resentencing.[2] (See *Drayton*, *supra*, 47 Cal.App.5th at p. 980 ["If, accepting the facts asserted in the petition as true, the petitioner would be entitled to relief because he or she has met the requirements of section 1170.95(a), then the trial court should issue an order to show cause"]; accord, *Duchine*, *supra*, 60 Cal.App.5th at p. 815 ["prima facie showing the [petitioner] must make is that he did not, in fact, act [as required] or harbor

---

[2]Though the People state substantial evidence establishes defendant was the actual killer in their briefing, both the parties cite *Drayton* as providing the appropriate standard for evaluating whether a defendant made a prima facie showing; we agree *Drayton* provides the appropriate framework for determining whether a defendant has made a prima facie showing under section 1170.95. (See *People v. Aleo* (May 27, 2021, F080005) __ Cal.App.5th __ [2021 Cal.App. Lexis 445 at p. *13; 2021 WL 2153821, at p. *5].)

the mental state required, for a murder conviction under current law" and "the time for weighing and balancing and making findings on the ultimate issues arises at the evidentiary hearing stage rather than the prima facie stage, at least where the record is not dispositive on the factual issues.  Thus, absent a record of conviction that conclusively establishes that the petitioner engaged in the requisite acts and had the requisite intent, the trial court should not question [the petitioner's] evidence"]; but see *People v. Garcia* (2020) 57 Cal.App.5th 100, 114–116, review granted Feb. 10, 2021, S265692 [trial court should determine whether substantial evidence supports the conclusion the petitioner *could* still be convicted of murder following the amendments to §§ 188 and 189 in determining if petitioner made prima facie showing of eligibility for relief].)

As required, here, defendant's petition alleged a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder following a trial; and he could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.  (§ 1170.95, subd. (a).)  And, contrary to the People's assertions, the record does not establish defendant is categorically ineligible for relief *as a matter of law*.  Rather, the jury instructions confirm defendant was prosecuted for murder under the natural and probable consequences doctrine.  Additionally, the record before us reflects there were multiple other individuals besides defendant that were involved in the fight that led to Maldonado's death; there was conflicting evidence presented at trial regarding who the actual killer was; and the jury acquitted defendant of first degree premeditated murder and did not find true allegations defendant personally used a knife in the commission of the murder or that he personally inflicted great bodily injury or death in the assault with a deadly weapon upon Zorrilla.  (Compare *People v. Tarkington* (2020) 49 Cal.App.5th 892, 899, review granted Aug. 12, 2020, S263219 [where record reflected murder involved single perpetrator, jury instructions did not

21.

include instructions on felony murder, aiding and abetting, or natural and probable consequences doctrine, and jury convicted defendant of second degree murder and found he personally used a dangerous and deadly weapon, record established defendant was actual killer as a matter of law and, therefore, not entitled to § 1170.95 relief] with *People v. Offley* (2020) 48 Cal.App.5th 588, 598 [court erred in concluding defendant was categorically ineligible for relief based on jury's finding he intended to discharge a firearm that caused great bodily injury or death because enhancement did not establish defendant acted with intent to kill or with conscious disregard to human life and did not rule out possibility jury relied on natural and probable consequences doctrine in convicting defendant].) Thus, the court necessarily would have had to weigh facts and draw inferences to conclude defendant was the actual killer or a major participant who acted with reckless indifference to human life. (See *Duchine*, *supra*, 60 Cal.App.5th at p. 816 ["major participant and reckless indifference findings the trial court made based solely on the record evidence entail the weighing of evidence, drawing of inferences, and assessment of credibility that should be left to the factfinding hearing process contemplated by section 1170.95, subdivision (d)"]; *Drayton*, *supra*, 47 Cal.App.5th at p. 982 [test which governs inquiry whether defendant was a major participant in a felony who acted with reckless indifference "necessarily requires the weighing of facts and drawing inferences," which trial court should not engage in without first issuing order to show cause and holding evidentiary hearing].)

True, the jury acquitted codefendant Gonzalez of Maldonado's murder, but the jury's conclusions regarding Gonzalez do not establish defendant was the actual killer as a matter of law. They simply reflect the charges as they related to Gonzalez were not proven beyond a reasonable doubt. (See *People v. Superior Court* (*Sparks*) (2010) 48 Cal.4th 1, 5 ["a verdict regarding one defendant has no effect on the trial of a different defendant"]; see generally *People v. Palmer* (2001) 24 Cal.4th 856, 860 ["The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely

satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence"].) Indeed, the prosecutor argued in closing, "If you don't know who the actual stabber is, then the aider and abettor theory applies to both defendants and the natural and probable consequences theory applies to both defendants." And nothing in the record before us establishes the jury found or the evidence presented at trial conclusively established defendant was the actual killer or a major participant who acted with reckless indifference to human life *as a matter of law*.

Accordingly, we reverse the court's order denying the petition and remand for further proceedings.

## DISPOSITION

The court's order denying the section 1170.95 petition is reversed. The court is directed to issue an order to show cause and to hold a hearing during which the prosecution bears the burden of proving beyond a reasonable doubt that defendant is ineligible for resentencing.